FILED IN OPEN COURT

MAR 10 2021

CHARLES R. DIARD, JR.
CLERK

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )     **CRIMINAL NO. 20-00122-TFM** |
| | ) |
| MARTIN CARLTON MELTON | ) |

## PLEA AGREEMENT

The defendant, **MARTIN CARLTON MELTON**, represented by his counsel, and the United States of America, have reached a plea agreement in this case, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the terms and conditions of which are as follows:

### RIGHTS OF THE DEFENDANT

1. The defendant understands his rights as follows:
   a. To be represented by an attorney;
   b. To plead not guilty;
   c. To have a trial by an impartial jury;
   d. To confront and cross-examine witnesses and to call witnesses and produce other evidence in his defense; and
   e. To not be compelled to incriminate himself.

### WAIVER OF RIGHTS AND PLEA OF GUILTY

2. The defendant waives rights b through e, listed above, and pleads guilty to Count One of the Indictment, charging a violation of Title 21, United States Code, Section 846, Conspiracy to Possess with Intent to Distribute Methamphetamine.
3. The defendant understands that the statements he makes under oath in the plea of guilty must be completely truthful and that he can be prosecuted for making false statements or perjury, or receive a perjury enhancement at sentencing, for any false statements he makes intentionally in this plea of guilty.
4. The defendant expects the Court to rely upon his statements here and his response to any questions that he may be asked during the guilty plea hearing.
5. The defendant is not under the influence of alcohol, drugs, or narcotics. He is certain that he is in full possession of his senses and is mentally competent to understand this Plea Agreement and the guilty plea hearing which will follow.
6. The defendant has had the benefit of legal counsel in negotiating this Plea Agreement. He has discussed the facts of the case with his attorney, and his attorney has explained to the defendant the essential legal elements of the criminal charge which has been brought against him. The defendant's attorney has also explained to the defendant their understanding of the United States' evidence and the law as it relates to the facts of his offense.
7. The defendant understands that the United States has the burden of proving each of the legal elements of the criminal charge beyond a reasonable doubt. The defendant and his counsel have discussed possible defenses to the charge. The defendant believes that his attorney has represented him faithfully, skillfully, and diligently, and he is completely satisfied with the legal advice of his attorney.
8. A separate document, entitled Factual Resume, will be submitted to the Court as evidence at the guilty plea hearing. The Factual Resume is incorporated by reference into this Plea Agreement. The defendant and the United States agree that the Factual Resume is true and correct. Alterations to the Plea Agreement or Factual Resume initialed only by the defendant and his counsel are not part of this agreement and are not agreed to by the United States.
9. This plea of guilty is freely and voluntarily made and is not the result of force, threats,

promises, or representations, apart from those representations set forth in this Plea Agreement. There have been no promises from anyone as to the particular sentence that the Court will impose. The defendant is pleading guilty because he is guilty.

10. The defendant also knowingly and voluntarily waives all rights, whether asserted directly or through a representative, to receive from the United States after sentencing any further records, reports, or documents pertaining to the investigation or prosecution of this matter. This waiver includes, but is not limited to, rights under the Freedom of Information Act and the Privacy Act of 1974.

## PENALTIES

11. The maximum penalty the Court could impose as to Count One of the Indictment is:
    a. 10 years imprisonment to life imprisonment;
    b. A fine not to exceed $10,000,000;
    c.     A mandatory minimum term of supervised release of five (5) years up to lifetime supervised released, which would follow any term of imprisonment. If the defendant violates the conditions of supervised release, he could be imprisoned for the entire term of supervised release;
    d.     A mandatory special assessment of $100.00; and
    e.     Such restitution as may be ordered by the Court.

## SENTENCING

12. The Court will impose the sentence in this case. The United States Sentencing Guidelines are advisory and do not bind the Court. The defendant has reviewed the application of the Guidelines with his attorney and understands that no one can predict with certainty what the sentencing range will be in this case until after a pre-sentence investigation has been completed and the Court has ruled on the results of that investigation. The defendant understands that at sentencing, the Court may not necessarily sentence the defendant in accordance with the Guidelines. The defendant understands that he will not be allowed to withdraw his guilty plea if the advisory guideline range is higher than expected, or if the Court departs or varies from the advisory guideline range.

13. The defendant understands that this Plea Agreement does not create any right to be sentenced in accordance with the Sentencing Guidelines, or below or within any particular guideline range, and fully understands that determination of the sentencing range or guideline level, or the actual sentence imposed, is solely the discretion of the Court.

14. The United States will provide all relevant sentencing information to the Probation Office for purposes of the pre-sentence investigation. Relevant sentencing information includes, but is not limited to, all facts and circumstances of this case and information concerning the defendant's conduct and background.

15. Both the defendant and the United States are free to allocute fully at the time of sentencing.

16. The defendant agrees to tender $100.00 to the U.S. District Court Clerk in satisfaction of the mandatory special assessment in this case. The United States reserves the right to withdraw any favorable recommendations it may agree to within this document if the defendant fails to pay the special assessment prior to or at the time of his sentencing.

## RESTITUTION

17. Pursuant to 18 U.S.C. §§ 3556 and 3663(A), restitution is mandatory. The defendant agrees to make full restitution in an amount to be determined by the Court at sentencing as to all relevant conduct regardless of whether it relates to the count of conviction.

## FORFEITURE

18. The defendant agrees to confess the forfeiture to the United States of all properties which represent proceeds of his criminal activities or which facilitated any aspect of these illegal activities.

## FINANCIAL OBLIGATIONS

19. The Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court. In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the Defendant agrees to disclose fully all assets in which the Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held

by a spouse, nominee or other third party.

## UNITED STATES' OBLIGATIONS

20. The United States will not bring any additional charges against the defendant related to the facts underlying the Indictment and will move to dismiss any remaining charges against the defendant once sentence is imposed in this case. This agreement is limited to the United States Attorney's Office for the Southern District of Alabama and does not bind any other federal, state, or local prosecuting authorities.

21. The United States will recommend to the Court that the defendant be sentenced at the low end of the advisory sentencing guideline range per count of conviction as determined by the Court.

## APPLICATION OF USSG § 5K1.1 AND/OR FED. R. CRIM. P. 35

22. The defendant understands and agrees that he has no right to cooperate, and that the decision whether to allow him to cooperate is reserved solely to the United States in the exercise of its discretion. If the United States agrees to allow the defendant to cooperate, and if the defendant agrees to cooperate, the following terms and conditions apply:

   a. The defendant shall fully, completely, and truthfully respond to all questions put to his by law enforcement authorities regarding the underlying facts of the offense(s) with which he is charged, as well as the underlying facts of any criminal offense(s), state or federal, of which he has information or knowledge.

   b. The defendant acknowledges that he understands that he shall provide truthful and complete information regarding any offense about which he has knowledge or information regardless of whether law enforcement authorities question his specifically about any such offense. This provision requires the defendant to divulge all information available to him even when law enforcement authorities do not know about the defendant's involvement, knowledge or information relating to any particular offense. This requirement extends to any and all persons about whom the defendant has such knowledge or information.

   c. The defendant agrees to cooperate completely with all law enforcement authorities in any matters to which his cooperation may be deemed relevant by any law enforcement authority. The defendant agrees to fully comply with all instructions from law enforcement authorities regarding the specific assistance he shall provide. This includes, but is not limited to, consenting to monitored and/or recorded telephone conversations, participating in undercover operations, testifying completely and truthfully before any grand jury, at any pre-trial proceeding, during any trial, and any post-trial proceeding.

   d. If the United States deems it necessary, the defendant may be required to take a polygraph examination(s) which will be administered by a government polygrapher. The defendant agrees that the results of any polygraph examination may be used by the United States in its evaluation of whether there has been substantial assistance, and are admissible at sentencing to rebut an assertion by the defendant of bad faith or

   unconstitutional motive on the part of the United States.

   e. The defendant agrees to turn over to the United States any and all documents, tapes and other tangible objects which are in his possession or under his control and which are relevant to his participation in and knowledge of criminal activities, regardless of whether it relates to the charged offense. This obligation is a continuing one and includes materials that the defendant may acquire, obtain or have access to after the execution of this agreement.

   f. The defendant also agrees to identify the assets of any other person which were obtained through or facilitated the defendant's illegal activities or the illegal activities of another.

   g. If the defendant provides full, complete, truthful and substantial cooperation to the United States, which results in substantial assistance to the United States in the investigation or prosecution of another criminal offense, a decision specifically reserved by the United States in the exercise of its sole discretion, then the United States agrees to move for a downward departure in accordance with Section 5K1.1 of the United

States Sentencing Guidelines or Rule 35 of the Federal Rules of Criminal Procedure, whichever the United States deems applicable. The United States specifically reserves the right to make the decision relating to the extent of any such departure request made under this agreement based upon its evaluation of the nature and extent of the defendant's cooperation. The defendant understands that the United States will make no representation or promise with regard to the exact amount of reduction, if any, the United States might make in the event that it determines that the defendant has provided substantial assistance. The defendant understands that a mere interview with law enforcement authorities does not constitute substantial assistance. The defendant also understands that, should he provide untruthful information to the United States at any time, or fail to disclose material facts to the United States at any time, or commits a new criminal offense, the United States will not make a motion for downward departure. If the defendant's effort to cooperate with the United States does not amount to substantial assistance as determined solely by the United States, the United States agrees to recommend that the defendant receive a sentence at the low end of the advisory guideline range.

h. The United States and the defendant agree that any breach of this agreement by the defendant, including but not limited to committing a new offense, failing to cooperate, intentionally withholding information, giving false information, committing perjury, failing to identify assets obtained by him from his illegal activities or obtained by others associated with him or of which he has knowledge, refusing to take a polygraph examination, failing a polygraph examination, or refusing to testify before the grand jury or at any judicial proceeding, would:

1. permit the United States to reinstate and proceed with prosecution on any other charges arising from the matters underlying the Indictment; and

2. permit the United States to initiate and proceed with the prosecution on any other charges arising from a breach of this agreement. The United States will not be limited, in any respect, in the use it may make against the defendant of any information provided by the defendant during his breached cooperation. Such breach will constitute a waiver of any claim the defendant could make under the United States Constitution, the Federal Rules of Evidence, the Federal Rules of Criminal Procedure, or any statute or case law by which the defendant seeks to suppress the use of such information or any evidence derived from such information.

i. Nothing in this agreement shall protect the defendant in any way from prosecution for any offense committed after the date of this agreement, including perjury, false declaration, false statement, and obstruction of justice, should the defendant commit any of these offenses during his cooperation. The defendant acknowledges and agrees that the information that he discloses to the United States pursuant to this agreement may be used against him in any such prosecution.

j. The United States and the defendant agree that the defendant will continue his cooperation even after he is sentenced in the instant matter. His failure to continue his cooperation will constitute a breach of this agreement, and the defendant agrees that under such conditions, the United States will be free to reinstate the charges and the prosecution of the charges in the Indictment, which are to be dismissed in accordance with this agreement. Under these circumstances, the defendant expressly waives any rights he may have under the statute of limitations and the speedy trial provisions.

## LIMITED WAIVER OF RIGHT TO APPEAL AND
## WAIVER OF COLLATERAL ATTACK

23.	As part of the bargained-for exchange represented in this plea agreement, and subject to the limited exceptions below, the defendant knowingly and voluntarily waives the right to file any direct appeal or any collateral attack, including a motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255. Accordingly, the defendant will not challenge his guilty plea, conviction, or sentence in any district court or appellate court proceedings.

    a.    **EXCEPTIONS.** The defendant reserves the right to timely file a direct appeal challenging:

    (1)    any sentence imposed in excess of the statutory maximum;

    (2)    any sentence which constitutes an upward departure or variance from the advisory guideline range.

The defendant also reserves the right to claim ineffective assistance of counsel in a direct appeal or § 2255 motion.

24. If the United States files a notice of appeal and such appeal is authorized by the Solicitor General, the defendant is released from the appellate waiver.

25. The defendant further reserves the right to timely move the district court for an amended sentence under 18 U.S.C. § 3582 in the event of a future retroactive amendment to the Sentencing Guidelines which would affect the sentence.

26. If the defendant receives a sentence within or below the advisory guideline range, this plea agreement shall serve as the defendant's express directive to defense counsel to timely file a "Notice of Non-Appeal" following sentencing, signed by the defendant.

## VIOLATION OF AGREEMENT

27. The defendant understands that if he breaches any provision of this Plea Agreement, the United States will be free from any obligations imposed by this agreement, but all provisions of the agreement remain enforceable against the defendant. In the exercise of its discretion, the United States will be free to prosecute the defendant on any charges of which it has knowledge. In such event, the defendant agrees not to assert any objections to prosecution that he might have under the Sixth Amendment and/or Speedy Trial Act.

28. In addition, if the defendant is released from detention prior to sentencing, he understands that the United States will no longer be bound by this agreement if he violates any condition of his release prior to sentencing or prior to serving his sentence after it is imposed.

## ENTIRETY OF AGREEMENT

29. This document is the complete statement of the agreement between the defendant and the United States and may not be altered unless done so in writing and signed

by all the parties.

Respectfully submitted,

RICHARD W. MOORE
UNITED STATES ATTORNEY

Date: March 1, 2021    */s/George F. May*

    GEORGE F. MAY
    Assistant United States Attorney

Date: March 1, 2021    */s/ George A. Martin*

    GEORGE A. MARTIN
    Assistant United States Attorney
    Deputy Chief, Criminal Division

I have consulted with my counsel and fully understand all my rights with respect to the offense charged in the Indictment pending against me. I have read this Plea Agreement and carefully reviewed every part of it with my attorney. I understand this agreement, and I voluntarily agree to it. I hereby stipulate that the Factual Resume, incorporated herein, is true and accurate in every respect, and that had the matter proceeded to trial, the United States could have proved the same beyond a reasonable doubt.

Date: 3-10-21

**MARTIN CARLTON**

**MELTON**                                          Defendant

I am the attorney for the defendant. I have fully explained his rights to his with respect to the offense(s) charged in the Indictment in this matter. I have carefully reviewed every part of this Plea Agreement with his. To my knowledge, his decision to enter into this agreement is an informed and voluntary one. I have carefully reviewed the Factual Resume, incorporated herein, with the defendant and to my knowledge, his decision to stipulate to the facts is an informed, intelligent and voluntary one.

Date: 3-10-21

JAMES M.

BYRD                                          Attorne
y for Defendant
7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHISN DISTRICT OF ALABAMA
## SOUTHISN DIVISION

UNITED STATES OF AMERICA          )

                    )

v.          )          **CRIMINAL NO. 20-00122-TFM**

                    )

MARTIN CARLTON MELTON                    )

## FACTUAL RESUME

The defendant, **MARTIN CARLTON MELTON**, admits the allegation of Count One of the Indictment.

## ELEMENTS OF THE OFFENSE

**MARTIN CARLTON MELTON** understands that in order to prove violation of Title 21, United States Code, Section 846, as charged in Count One of the Indictment, the United States must prove:

1. That two or more persons in some way or manner, came to a mutual understanding to distribute methamphetamine, or to possess methamphetamine with intent to distribute it;
2. That the defendant knowingly and willfully became a member of such conspiracy.

## OFFENSE CONDUCT

Defendant, **MARTIN CARLTON MELTON**, admits in open court and under oath that the following statement is true and correct and constitutes evidence in this case. This statement of facts is provided solely to assist the Court in determining whether a factual basis exists for **MARTIN CARLTON MELTON'** plea of guilty. The statement of facts does not contain each and every fact known to the defendant and to the United States concerning the defendant's involvement in the charges set forth in the plea agreement.

During the course of the conspiracy **MARTIN CARLTON MELTON,** aka MC conspired with Terry Lamont Owens, William Grant Owens, aka Whip, Edwin Owens, Lemont Stevens, Anthony Pierce, Annetta Gaynell Owens, Denton Stanley, Amber Russell, Kiairus Diamond, Reginald Burgess, Mortimer Cottrell, Ava Mae Jackson, Wendy Gale Roberts, Jay Dean Fisher, SN, and many others to possess with the intent to distribute methamphetamine, heroin, opioid pills and fentanyl.

Beginning around 2016 and continuing through 2018, Lemont Stevens was supplying methamphetamine Ice to the Crossley Hills DTO to include MC, Terry Owens and Whip. MC was buying very large quantities of Ice at a time. Stevens would use a large beverage cooler to store his methamphetamine Ice. Stevens would typically sell MC approximately 6-7 ounces of methamphetamine Ice at a time. MC's clientele/buyer network was so large that MC would sell the 6-7 ounces usually within a day and Stevens would then re-supply MC. This went on for several years.

Wendy Gale ROBERTS and MC have known each other for many years as they attended high school together. ROBERTS became a methamphetamine buyer from MC and MC sold ROBERTS methamphetamine from approximately 2016 through 2020. ROBERTS knew from buying methamphetamine from MC and knowing him that he had it available for sale every day.

ROBERTS would normally buy approximately one ounce of methamphetamine at a time and would get it two to three times a week from MC. ROBERTS would then sell the methamphetamine. ROBERTS would pay MC approximately $500 to $600 an ounce for the methamphetamine.

ROBERTS bought methamphetamine primarily mainly from MC but if he wasn't available then MC would have someone to sell it for him. On these occasions ROBERTS would call MC and he would state go on to "the house" (10524 Crossley Hill Drive) and someone would take care of her, i.e., sell her the drugs. The address of 10524 Crossley Hill Drive was the home of Ed Ray Patterson and Annetta Gaynell Owens. Ed Ray Patterson and Annetta Gaynell Owens would willfully and knowingly allow MC and other members of the DTO to sell drugs from their house and they would financially benefit by being paid money to allow the DTO members to sell from their house. Ed Ray Patterson and Annetta Gaynell Owens would often go to the casinos in Biloxi to gamble with the drug proceeds. Annetta Gaynell Owens also sold drugs from the house on more than 100 occasions on behalf of MC and on behalf of herself.

Numerous people at 10524 Crossley Hill Drive sold drugs from the house after being referred by MC, to include, PD, Khadarrin Crayton aka "KD", Avamae Jackson, Annetta Gaynell Owens, William Owens, Kiairus Diamond and Terry Owens.

On August 24, 2018, Bureau of Alcohol Tobacco, Firearms and Explosives (ATF) used a confidential informant (CI) to make a controlled buy from a co-defendant Martin MELTON aka "MC". An undercover Mobile Police officer (UC) drove the CI to Annetta Gaynell Owens' home located at 10524 Crossley Hills Drive. Upon arrival, the CI exited the vehicle and made contact with MELTON via phone. MELTON told the CI to "hit the block and come back". The CI got back in the car with the UC and they drove around the block. The CI came back to the residence and saw MELTON walking across the yard from another house. The CI met with MELTON who was standing next to the co-defendant, Ed Ray PATTERSON.

The CI negotiated with MELTON for the two ounces of Methamphetamine "ICE" for $1000.00. MELTON then reached into a brown book bag he was carrying and retrieved a clear bag containing methamphetamine. MELTON weighed the bag of methamphetamine, which weighed approximately 57 grams and then handed it to the CI. The CI handed the $1,000 to MELTON. Immediately after the transaction MELTON handed all or some of the $1,000 to the co-defendant PATTERSON.

Amber PARKER has dealt drugs with MC since approximately December of 2017 and was introduced to MC by RH. PARKER would trade stolen property to MC for cash and methamphetamine. PARKER then began to buy an "8-ball" of methamphetamine from MC every day. This lasted one month, until MC left for Virginia in 2018, and then MC directed PARKER to go to JD FISHER to buy her Ice while he was out of town.

In approximately March 2018, MC returned from Virginia and PARKER resumed her daily methamphetamine buying from MC. By the end of March 2018, PARKER began selling methamphetamine directly for MC, and MC provided her some customers to regularly sell to. PARKER began selling in ounce quantities for MC. From this point on, PARKER never sold less than 2 ounce of methamphetamine per day for MC. On the first transaction, MC first brought PARKER 3 ounces of methamphetamine to sell all to one person. PARKER was told by MC to

sell it, with $1800 to come back to MC ($600/ounce), and PARKER to price it for $700/ounce, so PARKER made $100 per ounce she sold.

MC began bringing multiple ounces of methamphetamine day every day to PARKER. Sometimes MC supplied PARKER more than once per day. The methamphetamine was already broken into one-ounce quantities by MC when he brought it to her, and PARKER never sold below an ounce. PARKER's sales ranged from 1 to 5 ounces. This lasted for about a month. PARKER never sold less than 2 ounces per day, so she sold a minimum of 60 ounces of MC's methamphetamine during this month.

From the end of March until mid-April 2018, customers that MC directed to PARKER for sales included JD FISHER, TJW, SW and others. At some point, FISHER was cut off from buying from MC so that was why he bought some Ice from PARKER.

In mid-April 2018, SW told PARKER he had a friend who wanted to buy heroin and asked if she could get it. PARKER confirmed MC had some heroin, and went to MC and got 2 points of heroin for $20 per point. MC had the heroin already in 1-point quantities in small baggies for PARKER. PARKER sold the heroin for $30 per point to SW, making $10 per point or $20 total profit.

When MC returned from Virginia, PARKER usually went to MC at to get the drugs to sell, with MC occasionally bringing it to PARKER at her trailer. MC was living at Annetta Owen's house on Crossley Hill Drive at that point.

PARKER continued conducting methamphetamine sales for MC from mid-April, 2018 progressing to selling 5-6 ounces every day, all provided directly from MC. PARKER had a single buyer that bought about 3-4 ounces per day from her. PARKER was still making $100 an ounce profit. This lasted 2½ months until June 2018, when one of PARKER's buyers, with the initials M.C. (not MELTON) went to jail and later died in custody. Prior to his arrest, the man with the initials M.C. had bought about 3-4 ounces from PARKER each time, at least a couple times per week, and resold it.

PARKER progressed to selling a least 5 ounces a day for $600 per ounce, or $3000 per day, equating to 150 ounces or $90,000 per month. This amounted to about 350-375 ounces total over this 2½-month period. PARKER made $100 per ounce sold or $500 per day, after paying MC. PARKER became a trusted Lieutenant for MC, often helping weigh out the drugs after MC came back from his source, and testing the methamphetamine for quality.

PARKER did not sell much of MC's heroin, she did not keep it on hand, and would have to go get it from MC after asking customers to give her an hour to get some. PARKER received about 10 points to 1 gram of heroin from MC total, and resold it during this time-frame in 2018.

In approximately May or June, 2018 PARKER entered into a relationship with Tristan Wayne NETTLES. They were each separately supplied by MC with methamphetamine and sold 12-14 ounces per week from their trailer. This continued from June until about October of 2018 when PARKER was arrested.

PARKER drove with MC over to the Pascagoula, MS area approximately 4-5 times, where MC picked up drugs from his supplier. PARKER drove and parked near a gas station called "Live Oaks" or "Southern Oaks". PARKER was not allowed by MC to get out of the car so she never saw the person MC met with. The drugs were always in a backpack when MC came back to the car. MC usually discussed buying "3-4 stacks" with the supplier on the phone prior to meeting with him. Later when MC and PARKER broke the drugs out back at her place, it was usually about 10 ounces of methamphetamine. MC also typically would have some heroin that he also received from the same supplier.

PARKER also went with MC many times to a trailer in the woods off of Bellingrath Road in Theodore. The supplier's street name was (redacted information), who PARKER did see at these meetings. The man was MC's uncle, and MC would get supplied methamphetamine by the man at least a couple times per week. Sometimes the man would bring his methamphetamine to MC also. MC usually obtained at least 10 ounces of methamphetamine from the man each time, and the Ice was very high quality, and cheaper because MC was related to the man.

The man was a steady source of methamphetamine for MC. From March until October 2018, MC purchased at least 10 ounces of methamphetamine per week from the man. Either MC would have PARKER or someone else drive him to the uncle, or the uncle would deliver it to MC. Approximately once a week MC told PARKER he had to go pick up pick up "Dogfood" (heroin). This happened once per week. On these occasions, MC usually had Denton STANLEY drive him in a white car.

STANLEY first met MC in 2016 when he stated going out to the Crossley Hill area to buy narcotics. STANLEY first started buying 10mg Opana pills from MC and was paying $50 to $60 a pill. In 2018 STANLEY began buying heroin from MC. STANLEY would buy a couple of points at a time and was paying $20 a point or he would give MC a ride somewhere and MC would pay him in heroin. From the beginning of 2018 to the end of 2018 STANLEY was buying heroin from MC everyday to a couple times a day, except for the times STANLEY was locked up

in the Mobile Metro Jail.

The color of the heroin would change and the colors were brown, tan, white and gray. There were times that STANLEY would buy from MC and MC would say be careful that's strong. STANLEY knew MC said that when the heroin contained fentanyl. STANLEY knew when there was fentanyl because the fentanyl was much stronger. STANLEY also bought methamphetamine (ICE) from MC approximately 15 to 20 times and it would be in eight ball amounts which STANLEY would pay $80 per eight ball.

STANLEY would sometimes drive MC to pick up narcotics. One of the places STANLEY would drive MC to was Jones Road. MC was getting methamphetamine (ICE) from a supplier from Jones Road. The location was a trailer on Jones Road and MC would meet a black male (redacted information) who was tall, skinny, with dreads, and around 25 to 35 years of age. MC was getting a half a pound to a pound of methamphetamine (ICE) from the man every time and STANLEY took MC approximately 5 times.

STANLEY would also drive MC to Pensacola, Florida to pick up narcotics. MC would pick up methamphetamine (ICE) and/or heroin from Pensacola. STANLEY drove MC to Pensacola approximately10 times. STANLEY also drove MC to Moss Point, Mississippi once or twice where MC obtained methamphetamine (ICE) from a supplier.

MC's uncle, who lived off Bellingrath Road, rode with MC and STANLEY a few times when MC obtained drugs from Pensacola. MC also had STANLEY go out to meet the uncle and try some heroin out one time. STANLEY tried out the heroin and went back and told MC that it was good heroin.

Anthony PIERCE began buying methamphetamine (ICE) from MC in mid-2016, until September 2018, making hundreds of buys from MC. PIERCE regularly bought at least½ ounce of Meth/Ice for each buy, and sometimes bought up to 2-3 ounces. The price was usually between $300 -$400 per ounce of Ice. Usually, PIERCE's buys from MC took place either at the "Blue House" on Dawes Road where he lived with his wife "AVA" and his nephew "KD", or they took place at Annetta OWENS's house on Crossley Hill Road where the family members congregated and sold drugs from. PIERCE has observed Kiairus DIAMOND sell drugs from both locations on numerous occasions and during the conspiracy MC regularly supplied DIAMOND methamphetamine and heroin to sell.

PIERCE bought drugs from Annetta OWENS aka: "Momma" multiple times. Annetta OWENS was also present about 100 times during transactions with MC, while MC sold PIERCE drugs. When MC was not available, Annetta sold to PIERCE at her house. PIERCE bought Ice/Meth from Annetta in ¼ ounce quantities. PIERCE also bought heroin from Annetta OWENS approximately 10 times,½ gram or 5 points (quantities) each time. The drugs were always pre-packaged in zip baggies in 1-point quantities (or approximately 1/10 of a gram).

There was a period of time that MC handled most of the Meth/Ice sales, and his brother "Terry" Owens handled most of the heroin sales, which began being sold by the dealers in the DTO sometime in 2018. PIERCE observed Terry Owens many times drive to Annetta's house and bring the heroin with him for Annetta to sell. PIERCE did not buy the heroin directly from Terry, but bought it from Annetta after TERRY delivered it to the house. PIERCE has seen TERRY many times, almost daily, "breaking down" and serving heroin to buyers from the front porch of Annetta's house.

Annetta typically kept drugs and money in a safe located in the first room on the left inside the house. The dealers would also sometimes keep the drugs in a blue-gray colored Nissan Titan parked in the back of the house, and PIERCE saw them get the drugs from these locations during transactions. Often MC would have PIERCE step into the laundry room near the front of the house to conduct the drug transactions.

On one occasion, MC took PIERCE with him down to William Owens' trailer located near the corner turn on Crossley Hill Drive down from Annetta's house, and MC showed PIERCE how they (the dealers) kept the larger amounts of drugs in long pieces of PVC pipe with caps on them.  Inside a section of PVC pipe, MC showed  PIERCE  how the pipes were pre-packaged with all types of drugs including opioid pills, heroin, and Meth/Ice. PIERCE has a tattoo on his right hand that has the initials "CHB", which stands for "Crossley Hill Boys".

In addition to buying drugs from MC and his dealers to support his drug addictions, PIERCE also sold drugs for MC off and on for about 2 years. MC would get the call from buyers, and he would direct PIERCE to serve them the drugs. MC would allow PIERCE to price the drugs up enough for PIERCE to make money from the transactions.

When MC lived at the "Blue House" on Dawes Road, he kept the bigger quantities of Meth/Ice in a black trash bag that MC kept in the brush behind the house. MC also kept his drugs in a backpack that he kept with him. MC regularly had about three pounds of Meth/Ice in his possession to sell. PIERCE witnessed MC receive about 10 pounds of Meth/Ice from his supplier at a time.

PIERCE was also one of several persons that MC had drive him around to conduct drug business, because MC did not like to drive. PIERCE was aware of one supplier to MC, an uncle

living on a road off of Bellingrath Road. On one occasion, PIERCE drove MC to meet with the uncle at the area of the roundabout at McFarland Road (but before it was paved). PIERCE witnessed MC pay the uncle $2500, and in exchange, the uncle gave MC 15 or 16 ounces of Meth/Ice.

MC also told PIERCE he had a supplier in Mississippi, but PIERCE did not meet or know the supplier. MC told PIERCE that the supplier in Mississippi supplied multiple types of drugs.

In addition to Meth/Ice, PIERCE has made many heroin buys from MC, about 30-50 times. Each purchase was usually about 1/4 ounce or a little more, but a few of the purchases were smaller, just a couple points. Close to the end of PIERCE's time making buys from MC, PIERCE was making 2 heroin buys each week, mostly to resell. PIERCE also occasionally used the heroin, especially when he did not have Meth/Ice.

PIERCE also taught MC how to "wash" Meth/Ice, a technique that would allow MC/PIERCE to determine if the drugs were "cut" (mixed) with other ingredients, which made the product less pure. This was done as a service by PIERCE so MC "would not get burned" from his suppliers. The process involved using acetone and MSN powder to wash Meth/Ice.

MC also sold "Grey Death", which was what the dealers called fentanyl. MC told PIERCE that he was trying to get all his pill buyers/customers to switch to using heroin because it was cheaper for him to get the heroin than the (opioid) pills.

The most Meth/Ice that PIERCE has seen in MC's possession at one time was approximately 15-20 pounds. This occurred on a day that PIERCE picked up MC and drove him to the Candy Store "Gentlemen's" club, where MC picked up girls. They also drove to America's Best hotel next to the Rode Way Inn at Tillman's Corner. One of the girls MC picked up was Sidney Elizabeth DUNN.

MC also directed PIERCE to deliver 1/4 ounce of Meth/Ice to an inmate named EP who was incarcerated at the Loxley Work-Release. PIERCE had previously introduced EP to MC (as a source of supply) prior to this delivery. Sidney DUNN went with PIERCE to deliver the drugs to EP at the Loxley Work-Release.

PIERCE also knew Jay FISHER, aka, JD as a methamphetamine dealer that sold Meth/Ice for MC. JD sold from his trailer that was located on Travis Family Road. MC moved to Virginia for a short period of time, approximately 2-3 months. MC told PIERCE to buy from JD while he was gone. PIERCE bought Meth/ICE from JD a few times, approximately an "8-ball to an ounce per occasion.

MC was arrested on February 14, 2019 after a search warrant was conducted at the "blue house" on Dawes Road. Approximately four days later, while MC was still in jail, Avamae JACKSON came to Wendy ROBERTS' house to ask ROBERTS for help to try and get MC bonded out of jail. During that meeting JACKSON also asked ROBERTS to sell a quarter to a half ounce of methamphetamine for her. ROBERTS sold the methamphetamine and gave Avamae the money from the methamphetamine sales, minus $100 that ROBERTS kept for her efforts.

While MC was in jail he also e-mailed JACKSON and directed her to collect money from Mark RUPPRECHT, aka, Ghost for money that Ghost owed MC because MC had previously "fronted" Ghost some heroin. Ghost was one of MC's more frequent customers for the heroin in Mobile. During periods of the conspiracy MC sold Mark Rupprecht 5 or 6 grams of heroin every two days for Rupprecht to sell and then get re-supplied by MC. MC sold Rupprecht more than 100 grams of heroin during the course of the conspiracy.

Wendy ROBERTS knew that MC had sold heroin to ROBERTS' son and ROBERTS confronted MC telling him that he was killing her son. This occurred in approximately September 2018.

On March 25, 2020 AvaMae Gaynell JACKSON was arrested in Mobile County after a traffic stop and found in possession of approximately 90.9 grams of fentanyl. JACKSON was given the drugs that same day by M.C. to hold for him. MC told JACKSON to come to Edwin Owens, aka, EJ's house to get the fentanyl from MC. MC told JACKSON that he was concerned he would get pulled over by law enforcement with the fentanyl so JACKSON agreed to hold it for MC. MC obtained the fentanyl earlier that same day from Reginald Irvin BURGESS in Pensacola.

MC had gone to Pensacola to obtain fentanyl from BURGESS on multiple occasions in the past two years prior to March 25, 2020. MC came back from Pensacola with the fentanyl he purchased from BURGESS and distributed it in the Southern District of Alabama. Kiairus Jamer DIAMOND, Terry Lamont OWENS, and AvaMae Gaynell JACKSON were among the persons that previously accompanied MC when he purchased fentanyl from BURGESS in Pensacola, Florida. Agents surveilled MC meeting with BURGESS on a number of these prior trips. Kiairus DIAMOND drove MC and Terry Owens to pick up fentanyl from BURGESS on some of these prior trips. Kiairus DIAMOND and Terry Owens accompanied MC on about 75 percent of the previous trips to Pensacola to pick up fentanyl from BURGESS.

MC had another source of supply for fentanyl named Chad DELEVIELEUSE. In early 2018, Chad DELEVIELEUSE started to order packages of fentanyl, shipped through the mails, from B.M. in California. The packages of fentanyl received by DELEVIELEUSE were typically one to two ounces. DELEVIELEUSE sold some of the fentanyl he received from California to MC and to Terry Owens. DELEVIELEUSE and Austin MAMUSCIA also travelled together from Baldwin County to Mobile to purchase heroin and fentanyl from MC and Kiairus Jamer DIAMOND on a number of occasions.

Mortimer Cottrell, aka "Boss" was one of MC's heroin sources of supply. Throughout the conspiracy, MC, on numerous occasions, negotiated with Cottrell for the delivery of heroin to MC. One such attempted delivery took place on March 4, 2020, when a Louisiana State Trooper conducted a traffic stop on a 2017 Nissan Maxima driven by Cottrell. The traffic stop occurred on I-10 eastbound, near milepost 30, in Calcasieu Parish. A search of the 2017 Nissan Maxima revealed approximately 70 grams of heroin in a plastic bag concealed in the center console. Cottrell was caught in the act of delivering the heroin to MC when he was caught with the heroin.

On another occasion during the conspiracy, Ava Mae JACKSON drove MC to New Orleans to meet Cottrell at a store, where MC purchased heroin from Cottrell.

While Lamont Stevens supplied MC with large amounts of methamphetamine during the conspiracy, during other periods of the conspiracy MC, Whip and Terry Owens supplied Stevens with methamphetamine Ice. Stevens also introduced Whip to a supplier of heroin in Pascagoula (MS), known as "DOGMAN" and DOGMAN started supplying Whip with heroin.

The United States and the defendant agree and recommend to the Court that the defendant conspired to distribute a combined amount of methamphetamine (actual) heroin, fentanyl and opioid pills during the conspiracy that would result in a Base Offense Level of 38.

The United States and the defendant agree and recommend to the Court that the defendant be held accountable for a 3 level leadership role in accordance with § USSG §3B1.1, in that the defendant was an organizer or leader of a criminal activity that involved five or more participants.

Respectfully submitted,

AGREED TO AND

SIGNED.

SEAN P. COSTELLO
UNITED STATES ATTORNEY

Date: _March 1, 2021_      /s/ _George F. May_____

GEORGE F. MAY
Assistant United States Attorney

Date: March 1, 2021      /s/ George A. Martin

GEORGE A. MARTIN
Assistant United States Attorney
Deputy Chief, Criminal Division

Date: 3-10-21

**MARTIN CARLTON**

**MELTON**                    Defendant


Date: 3-10-21

JAMES M. BYRD

Attorney for Defendant

7